Good morning, your honors. I'm John Rhodes from the Missoula Office of the Federal Defenders of Montana. I represent Dave Newcomb. I want to start with a quote from the transcript that Judge Malloy overlooked when he issued his order denying Mr. Newcomb's suppression motion. The defense counsel was cross-examining Highway Patrolman Bowers, who made the stop of Mr. Newcomb's pickup truck. And at ER 136, defense counsel asked, quote, you were doing a random stop of vehicles coming out of this area, were you not? The answer from Detective Bowers, or Highway Patrolman Bowers was, quote, at that point I was asked to do a random stop, yes, end quote. This was a random stop. Random stops are not permitted under our law. Going beyond that fact, which was overlooked in the judge's suppression ruling, the judge also said that a basis for the stop was that Mr. Newcomb's pickup truck was traveling in close proximity with two other pickup trucks. The facts show that Judge Malloy clearly erred in that ruling. Counsel, which patrolman's testimony were you highlighting to say that it was a random stop? Bowers. Bowers. It's at ER 136 of the Excerpts of Records we found. Bowers was instructed to stop the vehicle, so how would his testimony be dispositive on that point? Under the collective knowledge doctrine, Your Honor. And he says, I was asked to do a random stop, acknowledging that he was told by Sheriff Anderson to stop this vehicle. Well, we have to look at all of the evidence. You can't just isolate that one question, can you, to determine whether or not it was a random stop. No, I agree. We have to, excuse me, Your Honor, I didn't mean to interrupt you. We have to look at the totality of the circumstances. No doubt that is the law. So under the totality of the circumstances, is it your position it was a random stop? Yes. What other evidence is there besides that statement to indicate that this stop was random? The fact that they were sent in to collect intelligence on all the vehicles. Why does that make it random? Well, there are only five vehicles that they saw in the area before they stopped Mr. Newcomb's vehicles. We don't know what happened after that because it appeared that obviously the focus was on Mr. Newcomb at that point. And we would just argue that because they only stopped the one vehicle and the Detective Bowers, sorry, Highway Patrolman Bowers admitted under oath that it was a random stop, that that's what they were doing. Was that argument... I think we have the same question really. Tell us everything that was known at that moment. Well that's what I was getting to, the close proximity issue. The idea that this pickup truck driven by Mr. Newcomb was in close proximity to two other pickup trucks. That was one basis of the suppression ruling. That's clear error. Officer Height, who was the first officer on the scene, the scene being the FDR road which runs parallel to Lake Cucanusa, he said he saw those other two pickup trucks at mile marker one and a half to mile marker two. And he was traveling in the opposite direction. So he passes those pickup trucks at mile marker one and a half to mile marker two. He continues on in the other direction of those pickup trucks and that's when he passes Mr. Newcomb's pickup truck and he said that was at mile marker five and a half. So when you pass somebody three and a half mile markers apart and you're traveling in the opposite directions, those vehicles were at least, but certainly more than three and a half miles apart. So why is that clear error to say that's close proximity? Close is relative. But when you're on a road running along a lake where there's no cell phone service, which is very typical in rural Montana, but particularly in the mountains, when this is up in the mountainous part of the state in northwestern Montana, vehicles are not in close proximity when they're three and a half miles apart. Common sense says that. If they were traveling on an interstate, perhaps driving across, say, South Dakota, which is notorious for driving from Montana to the east, for being straight for miles after miles after miles, perhaps close proximity where there's radio traffic, where there's cell phone coverage would make sense. But how can it be clear error, though? I mean, how can it be clear error if you simply disagree on how close is close? I'm not saying that I simply disagree. I'm saying common sense would tell us that that just doesn't make sense. They were not traveling in close proximity. Well, tell us what else. Tell us about the airplane. The airplane had been reported by a, I believe it was Border Patrol first reported that it had flown over the border without authorization. They had known that two and a half weeks before approximately another airplane, they don't know if it was the same airplane or not, had flown over the border and landed on Lake Cucanusa. Also without clearance. Without clearance, correct. So that's what was known about the airplane. At some point it was known the second airplane on the day in question, August 17th of 2006, that that airplane actually did land in Lake Cucanusa and a Forest Service fire tower watchman or watch person, I don't know who it was, they reported they saw the plane leave the lake after landing for about five or ten minutes. When were the tire traps that had gone out into the water come back? When was that discovered or known? It's unclear if it was, certainly Patrolman Bowers did not know about that. It's unclear He doesn't have to know about that. Right. Under the collective knowledge document, that's true. It's unclear if that was known before or after the stop. I don't think that's clear in the record. One thing that isn't clear is that he was driving a Dooley pickup truck. Dooley means there's two tires on both the front and the set, so there are two sets of tires. Nothing was ever mentioned by Officer Hite. He's the person that went to Bristol Bay that saw these tire tracks, that he saw Dooley tire tracks. All he said was he saw tracks from tires. Certainly, Dooley tire tracks are very distinct from the tire tracks that probably everyone else in this room's heard of tires. There was nothing mentioned about that. What about the excuse that Newcomb gave for being off at the side of the road? When Sheriff Anderson first encountered Mr. Newcomb, Mr. Newcomb was pulled off in an apron, just basically a paved, I won't say a half circle, but almost maybe a rectangular part of a shoulder that's big enough for a vehicle to pull off on. Sheriff Anderson pulled up to Mr. Newcomb. He testified he was about 12 feet away. It sounds like he rolled down his window. Mr. Newcomb rolled down his window. Sheriff Anderson asked what he was doing. He said he was having fuel pump problems, and then he drove away. He said something more. Didn't he say he'd been asked by someone else to come down there and would have been in the woods all night trying to fix the truck? That I believe was later on when Highway Patrolman Bowers had pulled over Mr. Newcomb. He was asking what he was doing in the area, where he was going. He said he was returning to a campground where he had been summoned by a friend to repair the person's truck, including a fuel pump issue. That specifically was what he was doing in the area. Going back to the close proximity issue, one thing that I think is overlooked in the records and not acknowledged by the ruling below is that this was the height of the summer. It's both local Montanans and local residents. That also goes with the idea of these pickup trucks somehow being unusual. A pickup truck with a topper, or what's described in the record as a canopy, is an everyday occurrence. You can't drive around anywhere in Montana without seeing a pickup truck, so there's nothing unusual. What's the significance that they all came from the same county? Again, if you look on the map where Lake Cucanoose is, and it's a big map, it's easily identified, it's very close to Idaho. So the idea that you're going to see Idaho pickup trucks driving in Montana shouldn't be any basis for suspicion, particularly with this road. This isn't a drug-smuggling road, that that's what its overwhelming purpose is. This is a recreational road that's used all the time by RVs, pickup trucks, and SUVs. So there should be no significance given to that factor. A report found that one of the officers saw marijuana cigarettes in the glove compartment. When did that happen? That happened after Mr. Newcomb was pulled over by Highway Patrolman Bowers. He asked in the standard traffic stop procedure to see his registrations, his driver's license, his proof of insurance. He said that when Mr. Newcomb opened the glove compartment, two marijuana cigarettes were visible. What's questionable about that is it's merely suspected. The cigarettes apparently were never seized, they weren't tested, and even more concerning, Bowers, the officer, never even asked Mr. Newcomb, what are those? What about those cigarettes? Did this court credit to the testimony? He did credit, that's true. He credited Bowers' testimony, that is true. Your Honor, I've only got about 10 seconds left, so I'll try to reserve a little if that's possible. But before you do that, was the issue regarding the randomness of the search raised in district court? The way Judge Malloy does his suppression hearings, he has briefing first, then you have the hearing, then he permits some argument. So I don't know if it was raised in the briefing or not, and it's a very difficult practice procedure for the lawyers because you don't quite know what the testimony is going to be. You don't know that Detective Bowers is going to say, or Highway Patrolman Bowers is going to say, I was asked to do a random search. All right. Thank you. Okay, we'll hear from the government. Good morning again. Eric Wolf for the United States. The big issue here, and what I honestly think makes this an easy case, is the airplane that has come over the border. It's reported by the Border Patrol, a fire tower, sees it land. And what makes these vehicles suspicious, I mean, there's this close proximity business and things like that, but they are right there near the Bristol Bay part of the lake where this airplane just illegally landed. And there are only two other vehicles there. There's a logging truck and a motorcycle. And they officers wind up following the motorcycle and checking its plate. But they got on the scene right after that airplane took off, and these are the vehicles that are there. And that's very unlike... So your position is that any vehicle in the vicinity... Probably not the motorcycle, although they did check its plate. But given that you're going to... Any four-wheel vehicle... That could be used for smuggling. Is fair game. It's pretty suspicious, because they're there so quickly. Detective Hite says he gets the call at 1040. What happened to the other two vehicles? They continued on to Idaho. Once they got the marijuana out of Newcomb's truck, and Newcomb had presented this note to Don, that this is Donald Kramer's truck and I'm letting him have it, they sent out a bulletin to get Kramer's truck. And they arrested Kramer, and Kramer said, yeah, we were smuggling marijuana, and we'd done it before, and I was going to nuke him, I forget, $5,000 or something like that. You didn't answer my question. I'm sorry, I thought I did. What about the other two vehicles? They were stopped after they picked up nuke. You didn't say... Oh, I'm sorry, the logging truck and the motorcycle? No, no, the other two trucks. They were eventually stopped. What happened then? One of them was Don Kramer, and he was arrested, and he gave statements. I'm sorry, I was not clear about that. So the vehicles are fairly suspicious, just given their nature and their location and the timing. I mean, it's not that unusual to see pickup trucks in that part of Montana, I gather. Right. I'm not saying it's probable cause or anything like that, but those trucks are just landed, and that is illegal. That plane flew in across the border without permission, and they are right there, coming south as the officers are coming north. And so that sort of makes them, at least initially, suspicious. Well then you have this encounter with Sheriff Anderson, where Nukem is pulled off to the side, Anderson pulls up to him, and Anderson testifies. It was very suspicious. He says, I'm having fuel pump problems, and then the testimony is, Nukem drove off while I was trying to talk to him, and he didn't do a three-point turn or anything. He just goes down into the ditch and back up onto the pavement. And Anderson said, this guy doesn't want to talk to me, and he wants to get out of here. And he says, I thought that was suspicious. And so that's when he radios Bowers. Judge Fletcher, you had asked about the tire tracks. Detective Hite says he leaves Libby at 1040. He estimates that by 11 o'clock, he is at the bay, and he observes the tire tracks. He doesn't say whether they're dual-wheel tire tracks or anything like that, but by 11 o'clock, he's seen the tire tracks. At the hearing, nobody pieced together whether that was by the time Bowers had stopped Nukem or not. It almost certainly was, because 11 o'clock is relatively quickly from when the whole thing transpired, and Bowers has to follow Nukem for a while. He follows him around some corners, and then he stops him. So it's likely that he had seen the tire tracks by that time, but the record, I agree with Mr. Rhodes, the record's not clear about that. But he found them relatively quickly. So given the airplane, that you have these three trucks in close proximity to the airplane, much less to each other, which two of the trucks were definitely in close proximity to each other, they all have the same, they're all from the same county in Idaho, which leads to at least some suspicion that they're together. And then given Nukem's sort of goofy interchange with Anderson, that's enough for reasonable suspicion. And, you know, I read Erevezu in preparation. I had read it before, but I read this Court's opinion and the Supreme Court's opinion. Erevezu strikes me as a much less suspicious case than this one. This one seems far more suspicious, given that you actually had a border crossing, and they're in the area of this illegal border crossing, whereas Erevezu is just, they trip a censor on a road, and he follows them around, and the children are waving, and there was seems like there was much less in Erevezu. Counsel, what's your response to opposing counsel's emphasis on patrolman Bower's testimony that this was a random stop? I don't understand that testimony at all. It wasn't a random stop at all. He was called and told to stop this guy, and he was told to stop him because of observable suspicions about him, including Anderson. So it's just a sort of an odd piece of testimony. I think sometimes when officers are cross-examined, they're not quite sure what they're being asked, and they think they should agree, and they do. It's an odd piece of testimony. Well, he first says no, and this was on page 136 of line 7, and then somehow he gets turned around. Yeah. I don't understand why he said that, because it was not a random stop. Newcomb is who he was told to stop. A random stop would have been, you know, Haidt passing the logging truck, the three big trucks and the motorcycle, and radioing back and saying, stop them all. That would have been a random stop, and that's not what they were doing. They stopped somebody they thought was suspicious. So I don't know why he answered that way. Okay. Thank you. Your Honor, I'll give you a minute for rebuttal, if you'd like to take it. Thank you, Your Honor. Judge Rawlinson, at ER 172, the defense counsel did argue that the stop was random to Judge Malloy following the introduction of evidence. The government, trying to argue that the tire tracks must have been discovered by the time before Mr. Newcomb was pulled over. Well, she concedes that it's unclear. I think the governor also said that it was unclear as no one pieced together, but if you look at the timing, it must have. I think that shows, that attenuation shows how weak the government's case is. The same with emphasizing the close proximity of the three pickup trucks. They weren't in close proximity. If you look at the court's decisions in Manza Wando, which we cited in the briefs, the fact that this road is overwhelmingly used for lawful purposes, this is not some sort of the government's belief that basically any vehicle in that area is immediately suspect. The same goes with the fact that these are pickup trucks from a neighboring state only 50 miles away with toppers. Sigmund Ballesteros says that that has little probative value because pickup trucks from Idaho in western Montana with toppers are an everyday occurrence. We think the fact that the government's reaching shows how weak its case is, and we'd ask the Thank you. Okay, thank you. Case is sorted. We'll stand submitted. We'll next hear argument in United States v. Sequy.
judges: Kozinski, Fletcher, Rawlinson